## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **DOUGLAS BAKER, IN HIS** | § | |
| **INDIVIDUAL CAPACITY** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **DEPUTY CONSTABLE SEBASTIAN** | § | **CAUSE NO. 4:22-CV-03103** |
| **IN HIS INDIVIDUAL CAPACITY,** | § | |
| **DEPUTY CONSTABLE C. HOOVER** | § | |
| **IN HIS INDIVIDUAL CAPACITY** | § | |
| **(A/K/A C. HOOVER), AND** | § | |
| **HARRIS COUNTY** | § | |
| *Defendants.* | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

### I.    INTRODUCTION

1.    **COMES NOW**,  Plaintiff, **DOUGLAS BAKER**, Individually, (referred to as "Plaintiff" or "Baker" interchangeably), by and through his attorneys *Edward A. Rose, Jr.*, Attorney at Law, P.C. and *Kent Motamedi*, Attorney at Law, PLLC, and files this *First Amended Complaint* (hereinafter "amended petition" or "amended complaint" interchangeably) complaining of individuals Deputy Constable **SEBASTIAN** and Deputy Constable **C. HOOVER** (aka C. Hover) and entity **HARRIS COUNTY** (hereinafter collectively referred to as "Sebastian", "Hoover", "County", and "Defendants" respectively and collectively) and premised on the following amended pleadings, sets forth these cause of action and would respectfully show unto the Court and jury as follows:

### II.    JURISDICTION

2.    Plaintiff brings this civil rights lawsuit pursuant to 42 U.S.C. Section 1983 to redress the deprivation by Defendants, at all times herein acting under color of state law,

*Plaintiff's First Amended Complaint*

of rights secured to Plaintiff under the Constitution of the United States, including the Fourth, Eighth, and Fourteenth Amendments.

3.      Jurisdiction is conferred on this Court by 28 U.S.C. Sections 1343(a)(3) and (a)(4), which provide for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. Section 1983. Jurisdiction is also conferred by 28 U.S.C. Section 1331 because claims for relief derive from the Constitution of the United States and the laws of the United States. Further, this Court has jurisdiction over all Defendants because they have committed a tort in Texas and have had continuous contacts with Texas.

4.      This Court, moreover, has jurisdiction over claims against the County because Harris County is not immune from liability or suit. Harris County is a "*governmental unit*" as defined by Tex. Civ. Prac. & Rem. Code 101.001(3), *et seq*. However, governmental immunity has been waived in this instance by the Texas legislature under the Tort Claims Act because Plaintiff's injuries were caused by the negligent use of tangible personal property (taser) against Plaintiff.

5.      For these negligent uses of personal property, Defendant County is liable to Plaintiff as if those entities were private persons. Tex. Civ. Prac. & Rem. Code § 101.021(a)(2). Plaintiff by written correspondence dated September 11, 2020 complained of the incident and the Harris County Constable denied the complaint as unfounded on September 18, 2020 even though the body camera video shows the egregious actions by the Defendant Deputy Constables (*see* link provided by Harris County, Precinct 4 Constable's Office by and through Harris County Attorney's Office: https://caohctx.sharefile.com/d-sf04cd2140b4c40e7ac64dbffba785479). Defendant Harris County is also a "*person*" within the meaning of 42 U.S.C. § 1983 and subject to civil

liability pursuant to the doctrine outlined in *Monell v. Dept. of Social Services* (1978) 436 U.S. 658 which shall be expounded hereinbelow.

6.      Plaintiff brings this civil rights lawsuit pursuant to 42 U.S.C. Section 1983 to redress the deprivation by Defendants, at all times herein acting under color of state law, of rights, secured to Plaintiff under the Constitution of the United States, including the Fourth and Fourteenth Amendments. This Court has jurisdiction over all of Plaintiff's claims stated herein pursuant to the United States Supreme Court opinion in *Howlett v. Rose*, which provides that state courts have jurisdiction over suits brought pursuant to 42 U.S.C. § 1983. *See  Howlett v. Rose*, 496 U.S. 356 (1990).

### III.    VENUE

7.      Venue is properly established in the United States District Court for the Southern District of Texas pursuant to 28 U.S.C. Section 1391, in that the events and circumstances herein alleged occurred in the City of Houston, County of Harris, Texas, and all of the Defendants were either employed in or are residents of the City of Houston, Harris County in the State of Texas where jurisdiction is bestowed unto United States District Court for the Southern District of Texas located in Houston, Texas.

8.      In addition, venue for this action is mandatory in Harris County, Texas, pursuant to Tex. Civ. Prac. & Rem. Code § 15.015, which provides that a suit brought against a county shall be brought in that county, and Harris County is the county wherein all of the causes of action arose.

### IV.    PARTIES

9.      At all times, Plaintiff, Baker, resides outside Magnolia City and is a resident of Montgomery County, Texas.

10.     Defendant, County, is a governmental unit of the State of Texas. At all times herein Harris County, which oversees the Harris County Sherriff's Office (hereinafter "HCSO") as well as the Harris County's Commissioners Court and the precincts of Harris County, specifically, Harris County Precinct Four Constable's office, extends to the law enforcement arm of Harris County and under the administrative and operational control of Harris County. Pursuant to Tex. Civ. Prac. & Rem Code §§ 17.024(a), 101.001 *et seq*., Defendant, County, may be served with process by serving a copy of the citation or by mailing a copy of the citation and petition by registered or certified mail, return receipt requested, to the Honorable Judge *Lina Hidalgo*, County Judge, Harris County Administration Building, 1001 Preston, Suite 911, Houston, Texas 77002.

11.     At all times relevant to the facts and circumstances in the amended petition, Constable Sebastian was an individual residing on information and belief in Harris County, Texas and is a Deputy Constable, agent, and/ or employee of the County of Harris and whose acts as alleged herein were performed solely in his individual capacity and/or under color of state law who in concert with Defendant, Constable Hoover, arrested Plaintiff without probable cause and inflicted excessive force on Plaintiff without justification causing severe injuries to Plaintiff. Sebastian may be served by delivering to Defendant a copy of the citation and petition in person, or by mailing same to Defendant by registered or certified mail, return receipt requested at Defendants place of employment, Harris County Constable, Precinct 4, 6831 Cypresswood Dr., Spring, Texas 77379.

12.     At all times relevant to the facts and circumstances in the amended petition Defendant, Hoover, was an individual residing on information and belief in Harris County, Texas and is a Deputy Constable, agent, and/ or employee of the County of Harris and

*Plaintiff's First Amended Complaint*

whose acts as alleged herein were performed solely in his individual capacity and/or under color of state law who in concert with Defendant, Constable Sebastian, arrested Plaintiff without probable cause and inflicted excessive force on Plaintiff without justification causing severe injuries to Plaintiff. Hoover may be served by delivering to Defendant a copy of the citation and petition in person, or by mailing same to Defendant by registered or certified mail, return receipt requested at Defendants place of employment, Harris County Constable, Precinct 4, 6831 Cypresswood Dr., Spring, Texas 77379.

13.    In addition, the Defendant deputy constables' conduct, actions, and/or inactions directly caused, proximately caused, and/or was a substantial factor in causing the injuries to Plaintiff.

14.    In engaging in the conduct described herein, Defendant deputy constables acted in their individual capacities and/or under color of law while engaging in the conduct described above. In engaging in the conduct described herein, Defendant deputy constables exceeded the authority vested in them as constables under the United States Constitution.

15.    Plaintiff is informed and believes, and on such basis alleges, that each of the named Defendants was and is the agent, employee, principal, employer and/or co-conspirator of each of the remaining Defendants and/or vice versa. In addition, Plaintiff is informed and believes, and on such basis alleges, that the Defendants named hereinabove, and each of them, are responsible in some manner for the occurrences herein alleged, and that each of the above-named Defendants conspired with, and/or sided and/or abetted and/or jointly collaborated with each of the remaining Defendants and identified persons in committing the acts herein alleged in their individual capacities, as set forth below.

## V.    <u>FACTUAL BACKGROUND</u>

<u>16.</u>    At the time of the incident on August 28, 2020, at 6:00 PM, Plaintiff was driving a truck travelling east at 5900 block North Grand Parkway on Texas Route 99; on the day in question, it was pouring rain. Through no fault of the Plaintiff, the truck slid and hit the concrete barrier and spun out onto the unpaved center median. Plaintiff proceeded to inspect the damage while wearing only a t-shirt in the torrential downpour. Upon further inspection, Plaintiff determined that the truck was drivable even with a flat tire. Plaintiff was attempting to get the truck onto the paved shoulder of the median since the unpaved portion was on an incline and muddy.

<u>17.</u>    A good Samaritan truck driver stopped his vehicle and offered to assist Plaintiff to get his truck onto the paved shoulder of the medium using the Plaintiff's tow chains to assist in changing the tire. The tow chains were hooked up and before the truck could be moved, Harris County Pct. 4 Deputy Constable Sebastian arrived and, instead of assisting the Plaintiff to help him move the truck which was prepared and ready to be pulled at that moment onto the paved part of the medium, instead told Plaintiff to stop what he was doing even though on the paved medium the Plaintiff could change the tire and then resume his drive. Defendant, Sebastian, stated he would call a wrecker (tow truck). Plaintiff expressed his disagreement to this voluntary suggestion made by Sebastian.

<u>18.</u>    Defendant, Sebastian, being poorly trained and of like temper, and without the ability to effectively interact with the public, responded "*I don't give a f**k*". Defendant, Sebastian, demonstrated to all his lack of training, communication, and overall poor use of the English language. Plaintiff expressed his frustration by not being able to move the truck

and change the tire. Sebastian rather than assisting him responded by forcibly and violently pushing Plaintiff with both hands into his chest as a means of provocation.

19.    This was evident by the Body Camera that was provided to the Criminal Defense Attorney that represented Plaintiff in the malicious criminal case brought by Deputy Constables Sebastian and Hoover (*See* https://caohctx.sharefile.com/d-sf04cd2140b4c40e7ac64dbffba785479). Defendant, Sebastian, stated he was going to have the truck towed and arrest Plaintiff for interfering with the duties of a public servant despite the fact that during this entire encounter, the constable's presence was both voluntary and without engaging in any official investigation. Baker, juxtapose, took no actions nor acted in any manner nor demeanor that would prompt such provocation and threats uttered by Sebastian.

20.    Plaintiff told Defendant, Sebastian, that he had no right to be pushed and grabbed and proceeded to back away and removed the chains from the Good Samaritan's truck, telling him to leave rather than be brutalized for doing '*God's work*'. Shortly thereafter, Defendant, Hoover, arrived and immediately told Plaintiff he was under arrest for interference (of the duties of a public servant); it was obvious from Hoover's immediate action that Hoover and Sebastian had exchanged in correspondences prior to Hoover's arrival.

21.    Being poorly trained and in an effort to cover for Defendant, Sebastian, Hoover ordered Plaintiff to place his arms behind his back to be handcuffed without cause or reason. As Plaintiff was complying, Constable Sebastian, being untrained and unable to effectively communicate with the public, threatened to fire his aimed taser gun. Deputy

Constable Sebastian exclaimed "[Sic] *I'm gonna do it*". He then shouted "*knife*" and fired his taser across Plaintiff's heart into his rain soaked skin.

22.    Notwithstanding the fact that the knife was never brandished, never posed a harm to the officers, and the Plaintiff made the officers aware of the pocket knife in question – the knife itself was not one of a weapon but in fact a tool to cut wires as Plaintiff was also a licensed journeyman electrician and such tools were a necessity of his trade – said electrician's tool was located **inside his right front pocket with the clip only evident by sight.** Plaintiff had no access to this tool since he was in the process of being handcuffed and never showed any signs of brandishing, reaching, using, or making any attempts to conceal the worker's knife in question. All of these events are memorialized on the video recording (see link cited and provided above).

23.    What should have been an opportune time for the constables to assist a truck driver in a precarious situation, inclement weather present, soon turned into a heated exchange wherein Plaintiff was tased without cause or reason, suffered a heart attack as a result of the electrical shock, and was subsequently charged for crimes of resisting arrest and hindering apprehension in an attempt for Defendants to cover up their own incompetence and erroneous conduct.

24.    Upon being tased, Plaintiff fell to ground and both Deputy Constables jumped onto Plaintiff's **back** and **throat** handcuffing his wrists behind his back.  Plaintiff was semi-conscious. The Deputy Constables rolled Plaintiff's body over and one of them asked "[Sic] *are you gonna call the ambulance*?".

25.    Plaintiff, sometime later, was treated by Cypress Creek EMS. Plaintiff regained consciousness and Plaintiff's heart was beating irregularly as a result of this traumatic

attack. Plaintiff begged to be taken away from the Defendant constables but was told the Defendants would not relinquish custody. Plaintiff was transported to Harris County Jail downtown by another deputy.  Plaintiff was taken to the jail clinic **twelve (12) hours later** after Plaintiff stated he was experiencing severe chest pains. An EKG test was performed and Plaintiff was told "*you had a heart attack, but you're not having one now*".

26.    Plaintiff was released on personal reconnaissance bond. Plaintiff had a court appearance a month later for probable cause hearing and was appointed a criminal defense attorney. The criminal defense attorney obtained a copy of the camera video through discovery and asked to go to trial. **The prosecutor reviewed the video and dismissed the case in the '*interests of justice*'. The Harris County Case is identified as <u>Cause No. 232348501010</u> and incorporated herein by reference** (see attachments incorporated herewith this amended petition).

### VI.    <u>CAUSES OF ACTION</u>
### [AS TO THE INDIVIDUAL DEFENDANTS]

**VI. – A.       <u>42 U.S.C. SECTION 1983; UNLAWFUL SEARCH OF PLAINTIFF'S PERSON IN VIOLATION OF HIS FOURTH AMENDMENT</u>**

27.    Plaintiff hereby re-allege and incorporates by reference herein ¶¶ 18 through 26 hereinabove.

28.    In doing the acts complained of herein, Defendants Sebastian and Hoover, jointly and in their individual capacities, acted under color of law to deprive Plaintiff of certain constitutionally protected rights, namely that of an unlawful search of his person in violation of his Fourth (4th) Amendment right.

29.    Specifically, probable cause will exist for a warrantless search and arrest if, at the moment of arrest, facts and circumstances within the officer's knowledge and of which he

had reasonably trustworthy information were sufficient in themselves to warrant a person

of reasonable caution to believe a particular person committed an offense.

30.     A warrantless arrest will be authorized if a person is found in a suspicious place

and under circumstances that reasonably show that such person has been guilty of some

crime.

31.     Factors to consider in a determination of whether consent to search was voluntary

include: (i) whether Miranda warnings were given; (ii) the temporal proximity of the arrest

and search; (iii) the presence of intervening circumstances; and (iv) the purpose and

flagrancy of the official misconduct. Additional factors to consider in measuring the

attenuation are whether the individual was made fully aware that he could decline to

consent and whether the police purpose underlying the illegal arrest was to obtain the

consent. *Fowler v. State*, No. 01-93-00573-CR, 1995 Tex. App. LEXIS 3069, at *1 (Tex.

App. Dec. 7, 1995).

32.     In the current occurrence, Defendants, Hoover and Sebastian, were located at the

roadside with Baker in order to, originally, assist him with his broken down vehicle.

Thereafter, the dispute occurred which lead to a heated verbal exchange and the ultimate

tasing and arrest of the Plaintiff while being soaking wet due to the downpour of rain. At

no time was Baker held to suspicion by the constables, no arrest or search warrant was

issued against him, and, at all times, Baker remained compliant with the constable's save

for the disagreement as to the disposition and repair of the vehicles. This subject of the

arrest was neither for possession of a weapon, contraband, or any other illegal conduct or

item which would warrant a search in conjunction with the arrest. During the incident

which has made the basis of this suit, Plaintiff, at all times, remained cooperative and

peaceable during the officers search and verbally protested to his arrest. At no point in time did Plaintiff consent to being searched by the constables nor did probable cause exist.

33.    As matters escalated baselessly, the crux of the issue being that of Baker's method of repair versus Defendants recommendation/order to call a wrecker that they knew to take care of the vehicle, Defendants then unlawfully chose to tase Baker as the verbal argument escalated and proceeded to arrest him and, in the process of doing so, inflicted excessive force against him to a degree which caused him to suffer a heart attack and incur psychological trauma as a consequence of this exchange. The instigation stemming from Plaintiff asking why he could not move his vehicle to the side of the road ultimately lead to a heart attack being induced and caused by the Defendant constables when no such threat warranted the actions taken.

34.    During this unlawful arrest, no probable cause existed that Plaintiff was guilty of any crimes, in possession of contraband, or that there was any immediate, potential or proximate threats which would place the safety of the officers, any surrounding bystanders, or the Plaintiff himself at any degree of cognizable risk.

35.    The Fourth (4th) Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. U.S. Const. amend. IV. Under the "*automobile exception*," in cases where there was probable cause to search a vehicle, a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained. *Maryland v. Dyson*, 527 U.S. 465, 466-67, 119 S. Ct. 2013, 2014, 144 L. Ed. 2d 442 (1999) (per curiam) (emphasis in original) (quoting *United States v. Ross*, 456 U.S. 798, 809, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982)).

36.    A warrantless search is permissible under the automobile exception if (i) the officer conducting the search had 'probable cause to believe that the vehicle in question contain[ed] property that the government may properly seize'; and (ii) exigent circumstances justified the search." *United States v. Berry*, 664 F. App'x 413, 420 (5th Cir. 2016) (per curiam) (quoting *United States v. Castelo*, 415 F.3d 407, 412 (5th Cir. 2005) (alteration in original) (quoting *United States v. Reyes*, 792 F.2d 536, 538 (5th Cir. 1986))).

37.    When searching a vehicle without a warrant, "*a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.*" *United States v. Ross*, 456 U.S. 798, 809, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982). "*An individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband.*" *Id.* at 823. "*If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.*" *Id.* at 825.

38.    Probable cause is defined as "*whether at that moment the arrest was made, the officers had . . . facts and circumstances within their knowledge and of which they had reasonably trustworthy information that was sufficient to warrant a prudent man in believing that [Defendant] had committed or was committing an offense.*" *Charles v. Smith*, 894 F.2d 718, 723 (5th Cir. 1990) (quoting *Beck v. State of Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964)). The existence of probable cause is determined by reviewing the totality of the circumstances. *United States v. Antone*, 753 F.2d 1301, 1304 (5th Cir. 1985) (citing *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)).

39.    In addition, while the individual discretion of an experienced police officer can be a valid factor in determining the reasonableness of a search, as to the individual's person, this discretion is not unfettered, and no search can be justified on the basis of mere "*inarticulate hunches*". *Terry v. Ohio*, 392 U.S. 1, 23, 88 S. Ct. 1868, 1881 (1968). Moreover, the searching officer conducting a Terry "*stop-and-frisk*" need not establish probable cause, but he still must be able "*to point to specific and articulable facts which, taken together with rational inferences [drawn] from those facts [would] reasonably warrant [the] intrusion*." *Id.* 392 U.S. at 21. In the current occurrence, there was no basis to demonstrate reasonableness given the totality of the circumstances. The entire exchange went cordial and without any type of probable cause or suspicion arising until such time that the constables and Plaintiff began to argue as to the handling of the vehicle's repairs in question.

40.    Due to such tempers rising, such prompted the constables' arbitrary decision to quickly tase, subdue, and arrest the Plaintiff under false pretenses which, the origination of, stemmed from their dissatisfaction with the Plaintiff's unwillingness to acquiesce to the constable's recommendations. Despite the presence of a utility knife used in the course of Plaintiff's profession, as an electrician, the Defendants actions to handcuff the Plaintiff, coupled with the voluntarily and forthright disclosure of the pocket knife by Baker, in no way presented such a degree of risk or danger to the constables which would have warranted further actions to subdue the Plaintiff by way of taser and physical restraint thereafter. **Baker was already handcuffed and had no means of reaching nor using the pocket knife in question – no verbal or physical action by Baker indicated, to any reasonable or suspectable degree, that Baker intended, or could have intended, to use**

**the pocket knife in question as a weapon against the Defendant constables**. Had the constables been cautious, weary, or suspicious of the Plaintiff from the onset, the totality of the circumstances may have proven different, however, the constables in question were calm and unguarding throughout the interaction between themselves, the Plaintiff, and the good Samaritan until such time that the constables began to feel irate towards the Plaintiff and, to which, they imposed their authoritative roles unto Plaintiff as a result of their own subjective shortcomings.

41.    Although an exception to the probable cause requirement exists allowing Defendant constables to protect themselves by conducting a pat down of a suspect, the "*narrow scope*" of this exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked.

42.    In order to qualify as a person aggrieved by an unlawful search and seizure one must have been a victim of a search and seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search and seizure directed at someone else. *Henzel v. United States*, 296 F.2d 650, 652 (5th Cir. 1961).

43.    In the current suit, Defendant constables unlawfully arrested Plaintiff without probable cause, exigent circumstances, or a valid arrest warrant. At all times, the Defendant constables should have assisted the Plaintiff as he was trying to remove his truck from the highway but instead threatened and arrested him out of pure arbitrary anger due to their dissatisfaction as to Plaintiff's refusal to allow the constables to call a wrecker in lieu of simply moving the vehicle to the shoulder of the road. This disagreement ultimately lead to the Plaintiff being tased by the Defendants for no reason and proceeded to be detained,

searched, and arrested on allegations of hindering apprehension and resisting arrest even though the Defendant constables were the direct and proximate cause for Plaintiff's heart attack; the electrical shock of the taser in question being heightened in its efficacy due to the wet person of the Plaintiff caused by the rain and, to which the constables were, or should have been, aware of such state and condition. Ultimately, the criminal charges were subsequently dismissed after the body video was reviewed by the District Attorney's office.

44.     In addition, Defendant, Hoover, had a duty to protect Plaintiff from the unlawful actions of Defendant, Sebastian, as his superior but failed to stop the unwarranted tasing of the Plaintiff and, instead, acting in concert with Sebastian.

**VI. – B.      42 U.S.C. SECTION 1983; EXCESSIVE FORCE**

45.     Plaintiff hereby re-allege and incorporates by reference herein ¶¶ 18 – 26 hereinabove.

46.     In doing the acts complained of herein, Defendants Sebastian and Hoover, jointly and in their individual capacities, acted under color of law to deprive Plaintiff of certain constitutionally protected rights, namely that of inflicting excess force unto Plaintiff in violation of his constitutional rights under the Fourth (4th) and Fourteenth (14th) Amendment.

47.     To state a claim for excessive force under the Fourth (4th) Amendment, a Plaintiff must "*first allege facts capable of showing that they suffered a seizure*." *See Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004) (internal citation omitted). Plaintiff must further plead three pertinent elements: (i) an injury, (ii) resulting directly and only from the use of force that was excessive to the need, and (iii) the use of force was objectively unreasonable. *Bush*, 513 F.3d at 501.

48.    In the current occurrence, Plaintiff has suffered significant, permanent, physical and psychological injury while being seized by Defendant constables. While there is no bright line rule regarding extent of injury, courts have held that it must be more than *de minimis*. *See Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) (asserting that the injury must simply be more than *de minimis* "*evaluated in the context in which the force was deployed*."). The unlawful conduct exhibited by Hoover and Sebastian by unjustifiably tasing, physically restraining, and abetting in the tasing and physical restraing and arrest of Baker, during a routine stop to, originally, assist the Plaintiff with his vehicle which is neither within the course of an official investigation nor involving any type of violent or non-violet crime is, by definition, excessive.

49.    As a result of this unconstitutional conduct exhibited by Hoover and Sebastian, Plaintiff suffered a severe heart attack and heart murmuration due to the tasing (which was further heightened by Plaintiff being soaking wet due to the rain at the time of receiving said electrical shock). Plaintiff's injuries exceed the *de minimis* standard required and, thus, he has sufficiently stated a claim for a cognizable injury herein.

50.    Moreover, Plaintiff injuries are a direct and proximate result from the force Hoover and Sebastian caused by tasing him and subsequently throwing him unto the ground, restraining him by his back and neck after being tased, and arresting him despite Plaintiff complying throughout the course of the altercation and, pursuant to the video attached herewith; Baker never resisted arrest. It has been clearly established by the Fifth Circuit that even the use of relatively minor force, such as ***'pushing, kneeing, and slapping'*** is excessive when deployed against "*a suspect **who is neither fleeing nor resisting arrest***." *Sam v. Richard*, 887 F.3d 710, 714 (5th Cir. 2018) (collecting cases). In the current

occurrence, although the parties in question were arguing, verbally, Baker never physically resisted nor fled from the constables' as he was being arrested.

51.    The electrical shock that was caused by the Plaintiff being tased, whilst wet, was to such an extent that Plaintiff's heart was severely and permanently affected as a result. Such force is unwarranted in a situation wherein Plaintiff neither resisted arrest and the purpose of the officers visit, initially, to assist in the Plaintiff's vehicle. It is a far stretch of the mind to assume that Plaintiff was posing as an immediate threat to the safety of the constables or others, which he was not, and Plaintiff was never actively resisting arrest or attempting to evade arrest at any point in time during the altercation in question.

52.    Plaintiff can and has met the required causal nexus between Defendants', Hoover and Sebastian, excessive force in tasing and restraining the Plaintiff – which was excessive given the totality of the circumstances – and Plaintiff's has incurred cognizable injuries as a result.

53.    Plaintiff further pleads that Defendants', Hoover and Sebastian, use of force was unreasonable under the circumstances presented. Courts may consider three factors in determining whether a particular use of force was reasonable or excessive to the need: (i) the severity of the crime, (ii) whether the suspect posed an immediate threat to civilians or law enforcement, and (iii) whether the suspect was actively resisting or evading arrest by attempting to flee the scene. *Graham*, 490 U.S. at 396 (1989); *Khansari v. City of Houston*, 14 F.Supp.3d 842, 853 (S.D. Tex. 2014).

54.    Premised on the foregoing elements: (i) Plaintiff was never the target of a suspected crime nor posed as any type of threat to the constables and, further, the basis for the arrest arose over a verbal altercation alone; (ii) Plaintiff demonstrated and showed, from both the

circumstances, his behavior, and his person, that he was never an immediate threat to civilians or law enforcement and, conversely, he was cooperative, peaceable, and calm despite the disagreement over the handling of the vehicle; and (iii) Plaintiff was never resisting arrest, never made an attempt to flee, and at all times was cooperative with law enforcement officers whose initial mission was to simply assist in the Plaintiff's vehicle.

55.    The only action that Plaintiff took while being arrest was voicing his opinion to the constables as to his desire to have the vehicle placed on the side of the road in lieu of incurring expense by means of a wrecker coming out to pick up the vehicle. This minor action of Baker voicing his opinion is not commensurate with Defendant Hoover and Sebastian's force employed in tasing and restraining the Plaintiff to the degree of causing permanent and irreparable injury to his person and psyche. As a result, Defendants' force was objectively unreasonable under the circumstances and, as a result, the constables violated Plaintiff's Fourth (4th) Amendment rights by using excessive force against him.

56.    Finally, Defendants, Hoover and Sebastian, are not entitled to qualified immunity. To overcome the defense of qualified immunity, a Plaintiff must show that the official violated a constitutional right, and that the constitutional right was clearly established at such time. First, Plaintiff has shown that Defendant constables use of force was unreasonable, which is a violation of a constitutional right. Second, that constitutional right was clearly established at the time. Plaintiff has a clearly established right to be free from excessive force when the tasing and arrest occurred as the circumstances and premise for such actions were all but wanting in the circumstance presented. *See Deville*, 567 F.3d at 169 (citing *Tarver v. City of Edna*, 410 F.3d 745, 753-54 (5th Cir. 2005))

57.     Furthermore, it is clearly established that the amount of force Defendant constables could use depends on the severity of the crime, whether Plaintiff posed a threat, and whether Plaintiff was attempting to resist or flee. Plaintiff was never resisting arrest or attempting to flee when Defendant constables handcuffed and tased Baker, causing significant and permanent bodily injuries as a result. Such force was both excessive and unreasonable and in light of the totality of the circumstances and Baker's nonviolent, stationary behavior; Baker never resisted or evaded arrest at any point in time throughout the verbal argument and altercation between the constables and himself. As a result, Defendants' cannot claim defense under qualified immunity.

58.     The right not to be deprived of life or liberty without due process of law, as guaranteed by the Fourteenth (14th) amendment to the United States Constitution; the Plaintiff's guaranteed constitutional civil rights were violated based on the outrageous claims and actions of the Defendants. The outrageous actions and abuse of appointed authority of the Defendants has resulted in permanent heart damage and psychological trauma due to his injury as well as mental and emotional pain and suffering caused by the traumatic incident.

59.     These rights under the Fourth (4th) and Fourteenth (14th) amendments were clearly established federal constitutional rights, years before the incident complained of by Plaintiff.

60.     Plaintiff's damages proximately caused by the Defendants include unlawful arrest and imprisonment, physical pain and suffering, mental pain and suffering, loss of wages due to the injuries caused by the Defendants, past and future medical expenses, and humiliation.

61.     Plaintiff suffered injury that resulted directly and only from the use of force that was clearly excessive to the needs of the circumstance, and the force used was objectively unreasonable in light of what a reasonably prudent officer would due in like circumstances.

**VI. – C.     MALICIOUS PROSECUTION / FILING OF A FALSE POLICE REPORT  IN VIOLATION OF PLAINTIFF'S SUBSTANTIVE DUE PROCESS RIGHTS AND PURSUANT TO THE FOURTEENTH AMENDMENT**

62.     Plaintiff hereby re-allege and incorporates by reference herein ¶¶ 18 – 26 hereinabove.

63.     In doing the acts complained of herein, Defendants Hoover and Sebastian, jointly and in their individual capacities, acted under color of law to deprive Plaintiff of certain constitutionally protected rights, namely that of malicious prosecution perpetrated by Defendant constables in violation of Plaintiff's Fourth (4th) and Fourteenth (14th) Amendment substantive due process rights.

64.     Notwithstanding the foregoing mentioned hereunder, Plaintiff was unlawfully arrested by Defendants, Hoover and Sebastian, in deprivation of Plaintiff's established constitutional rights when no such circumstances, probable cause, or warrant was the basis of such unlawful arrest. Thereafter, two charges were brought against Plaintiff and filed under a police report and pursuant to Cause No. 232348501010 (see aforementioned attachment) in which the officers allege that Plaintiff is charged with (i) resisting arrest and (ii) hindering apprehension. However, the video footage of the constables, and coupled with the facts plead hereunder paint a polar opposite chain of events. At no time was the Plaintiff evading, fleeing, or resisting arrest. Plaintiff became the victim of an unlawful search, seizure, and arrest due to an incidental stop in attempts to, originally, assist the Plaintiff with his vehicle. That, at all pertinent times, Plaintiff was calm, peaceful, and

refrained in all actions save for verbal protests to the constables recommendations to have a wrecker pick up the vehicle in lieu of Baker and the good Samaritans attempts at repairs, and until the point in which the constables became irate and subsequently assaulted, detained, and arrested the Plaintiff against his established constitutional rights.

65.    Thereafter, the officers knowingly, intentionally, and willingly filed a false police report that was subsequently picked up by the district attorney's office in Harris County and, to date, the District Attorney's Office has subsequently dismissed the charges on all counts.

66.    A police officer may be liable under a Fourth (4th) Amendment malicious prosecution claim, pursuant to 42 U.S.C. § 1983, for filing false charges or **providing false information** to the prosecuting attorney when the officer is sufficiently involved with the prosecution that he may be said to have initiated the prosecution. *Limon v. U.S.*, 579 F.3d 79 (1st Cir. 2009) (proof did not establish that FBI agents initiated state prosecution, but Plaintiff prevailed on claim of intentional infliction of emotional distress); *Awabdy v. City of Adelanto*, 368 F.3d 1062 (9th Cir. 2004); Reed v. City of Chicago, 77 F.3d 1049 (7th Cir. 1996); *Eubanks v. Gerwen*, 40 F.3d 1157 (11 Cir. 1994); Dellums v. Powell, 660 F.2d 802 (D.C. Cir. 1981); *Hampton v. Hanrahan*, 600 F.2d 600, 630 (7th Cir. 1979), cert. granted in part, judgment rev's in part on other grounds, 446 U.S. 754, 100 S. Ct. 1987, 64 L. ed. 2d 670 (1980).

67.    Further, it has been held that where an officer withholds exculpatory evidence from the prosecutor during the course of criminal proceedings, the continuation of the criminal case establishes malicious prosecution against that officer. *Sanders v. English*, 90 F.2d

1152 (5th Cir. 1992) (rejected on other grounds by *Shneider v. Simonini*, 33, 749 A.2d 336 (2000); Goodwin v. Metts, 885 F.2d 157 (4th Cir. 1989).

68.    As in false arrest and detention cases, police officers may argue that the decision of a prosecuting attorney, judge or grand jury to file or approve charges should insulate them from liability for malicious prosecution. However, in *Wheeler v. Cosden Oil and Chemical Co.*, 744 F.2d 1131 (5th Cir. 1984) (see *Hand v. Gary*, 838 F.2d 1420 (5th Cir. 1988)), the Court there held that the "*break in the causal chain*" argument is applicable only to false arrest and imprisonment cases and would not bar an action for malicious prosecution. In addition, it has been held that the intervening action by a prosecuting attorney or a court only creates a rebuttable presumption that an independent judgment as to probable cause has been made, and that the Plaintiff may demonstrate that the police officer's deliberate misrepresentation of certain facts caused the charges to be filed. *Manganiello v. City of New York*, 612 F.3d 149 (2d Cir. 2010); *Fletcher v. Burkhalter*, 605 F.3d 1091 (10th Cir. 2010) (officers who conceal or misrepresent facts are not insulated from malicious prosecution claim by actions of prosecutor and court); *Hartman v. Moore*, 547 U.S. 250, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006)

69.    Here, Plaintiff has shown by a preponderance of the evidence, both through the video footage submitted, the comparable false police report and case number provided, and the pleadings themselves that Plaintiff, at no point in time resisted arrest or attempted to hinder apprehension. Once the evidence is reviewed it can be shown and found that the opposite transpired; that Plaintiff, at all pertinent times, was calm in his physical demeanor, notwithstanding the verbal altercation, and that he never posed as a threat to the constables during the exchange of words and arguments that ensued up to the point in time where he

was tased and arrested; the only action Plaintiff took was that of protesting the constables'
suggestion to have his vehicle towed; verbal communications in no way constitutes as
resisting arrest – even the farthest stretch of the imagination would fall short to make such
a preposterous correlation between the two.

### VII.   CAUSES OF ACTION
### [AS TO THE COUNTY]

### VII. – A.   COUNTY'S LIABILITY PURSUANT TO THE
### TEXAS TORT CLAIMS ACT; SUPPLEMENTAL JURISDICTION

70.   Federal jurisdiction exists over an entire suit, including state law claims, when the
federal and state law claims derive from a **common nucleus of operative fact** and the
Plaintiff would be expected to try them both in one judicial proceeding. *Quick v. VistaCare,
Inc.*, 864 F. Supp. 2d 492, 498 (N.D. Tex. 2012) (Fish, J.) (citations omitted).

71.   The *Gibbs* standard has been replaced by the Judiciary and Judicial Procedure Act,
28 U.S.C.A. § 1367 (1990); see *Raygor v. Regents of the Univ. of Minnesota*, 534 U.S. 533,
533, 122 S. Ct. 999, 152 L. Ed. 2d 27 (2002). In determining whether to exercise or decline
supplemental jurisdiction over state law claims, a court may consider both the factors listed
in 28 U.S.C. § 1367(c), and common-law factors of "*judicial economy, convenience,
fairness and comity*." *Enochs v. Lampasas County*, 641 F.3d 155, 159 (5th Cir. 2011).

72.   Specifically, 28 USCS §1367 provides:

> *(a) Except as provided in subsections (b) and (c) or as expressly provided
> otherwise by Federal statute, in any civil action of which the district courts have
> original jurisdiction, the district courts shall have supplemental jurisdiction over
> all other claims that are so related to claims in the action within such original
> jurisdiction that they form part of the same case or controversy under Article III
> of the United States Constitution. Such supplemental jurisdiction shall include
> claims that involve the joinder or intervention of additional parties.*

73.   In addition, pursuant to Tex. Civ. Prac. & Rem. Code § 101.021 a governmental
unit in this state is liable for:

*(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:*

*(A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and*

*(B) the employee would be personally liable to the claimant according to Texas law; and*

*(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.*

74.    The County has waived all rights to governmental immunity pursuant to Tex. Civ. Prac. & Rem. Code § 101.025.

75.    In the current occurrence, the County is liable under the *Texas Tort Claims Act* (hereinafter "TTCA") because Plaintiff's injuries were caused by the negligent use of tangible personal property (the taser used to subdue Plaintiff) issued by Harris County, by and through Harris County Commissioners Court, HCSO, and through its related branch, Harris County, Precinct 4 Constable's Office.

76.    Courts define "*taser guns*" as "*conducted energy weapons*" that use propelled wire to channel energy to a remote target, thereby controlling and overriding the body's central nervous system. *Draper v. Reynolds*, 369 F.3d 1270, 1273 n.3 (11th Cir. 2004). A taser gun can fire two probes up to twenty-one (21) feet, which are connected to the hand-held taser gun via high-voltage, insulated wire. *Id.* When the probes touch the target, the taser gun transmits electrical pulses along the wires and into the body of the target. *Id.*

77.    For the negligent uses of personal property, by and through the Defendant constables in question, the County is liable to Baker premised on the negligent and unlawful use of the *motor-driven equipment*, *i.e.* the taser in question, that the constables/employees of the county were duly issued and, to which such caused personal injury to Baker based on the negligent use of said personal property. Tex. Civ. Prac. &

Rem. Code § 101.021(1) and (2). As stated above, Plaintiff by written correspondence complained of the incident and Harris County denied the complaint as unfounded on September 18, 2020 even though the body camera video shows the egregious actions taken by the Defendant constables and, in such act, the taser in question can be seen to be used, unlawfully, against Baker in violation of his constitutional rights (see link cited hereinabove this amended petition accordingly).

**VII. – B.**        **43 U.S.C. SECTION 1983; MONELL RELATED CLAIMS; IDENTIFYING THE POLICIES; INADEQUATE TRAINING;**

78.    Defendant county is a "*person*" within the meaning of 42 U.S.C. § 1983 and subject to civil liability pursuant to the doctrine outlined in *Monell v. Dept. of Social Services* (1978) 436 U.S. 658.

79.    Defendant county, including through its constables and those individuals in their official capacity who had supervisory and/or policy making authority, had a duty to Plaintiff at all times to establish, implement and follow policies, procedures, customs and/or practices (hereinafter referred to as "*policy*" or "*policies*") which confirm and provide the protections guaranteed under the United States Constitution, including those under the Fourth (4th) and Fourteenth (14th) Amendments, to include without limitation, the protection of the right to be free from unlawful search and seizures and excessive force applied by its police deputy constables.

80.    Specifically, the county is the correctly named party pursuant to the following chain-of-command and infrastructure so codified by statutory law:

a.    The County is formed by and through Tex. Loc. Gov't Code § 71.022 which states that if a County is established – in this instance Harris County – the commissioners court of the county from which the largest part of the

territory of the new county is taken shall . . . divide the new county into convenient precincts for the election of justices of the peace and constables; and select convenient polling places in the new county. In addition, the commissioners court shall direct the county clerk to make a record of its actions under this section and shall transmit a copy of that record to the person who is elected county judge of the new county;

b.  As a part of the established county, Tex. Loc. Gov't Code § 81.001 states that the members of the commissioners court are the county judge and the county commissioners. If present, the county judge is the presiding officer of the commissioners court. This subsection does not apply to a meeting held under Section 551.127, Government Code, if the county judge is not located at the physical space made available to the public for the meeting;

c.  In continuation of the established County, the commissioner's court, and the county judge, Tex. Loc. Gov't Code § 86.011 states that an elected constable who desires to appoint a deputy must apply in writing to the commissioners court of the county and show that it is necessary to appoint a deputy in order to properly handle the business of the constable's office that originates in the constable's precinct. The application must state the name of the proposed deputy. The commissioners court shall approve and confirm the appointment of the deputy only if the commissioners court determines that the constable needs a deputy to handle the business originating in the precinct. Each deputy constable must qualify in the manner provided for deputy sheriffs under Section 85.003;

d.   Tex. Occ. Code § 1701.103 states that the commissioner's court shall develop and implement policies that clearly define the policy-making responsibilities of the commission and the management responsibilities of the executive director and the staff of the commission;

e.   That as the policymakers of the County, such commissioners court shall include within their membership, pursuant to Tex. Occ. Code § 1701.051, nine members appointed by the governor with the advice and consent of the senate as follows: (i) three members who are sheriffs, constables, or chiefs of police; (ii) three members who: (A) are licensed under this chapter, two of whom are peace officers who, at the time of appointment, hold nonsupervisory positions with a law enforcement agency; and (B) have been licensed under this chapter for the five years preceding the date of appointment; and (3) three members who represent the public.

f.   That pursuant to the appointed members of the commissioner's court, Tex. Occ. Code § 1701.270 promulgates that not later than the 180th day after the date the commission provides the model policies described by Section 1701.269(b), each law enforcement agency in this state shall adopt a policy on the topics described by that subsection. A law enforcement agency may adopt the model policies developed by the commission under that subsection;

g.   That premised on Tex. Occ. Code § 1701.2551, the basic peace officer training course required as part of a peace officer training program under Section 1701.251(a) may be no less than 720 hours; the basic peace officer

training course must include training on: (1) the prohibition against the intentional use of a choke hold, carotid artery hold, or similar neck restraint by a peace officer in searching or arresting a person, unless the officer reasonably believes the restraint is necessary to prevent serious bodily injury to or the death of the peace officer or another person; (2) the duty of a peace officer to intervene to stop or prevent another peace officer from using force against a person suspected of committing an offense if: (A) the amount of force exceeds that which is reasonable under the circumstances; and (B) the officer knows or should know that the other officer's use of force: (i) violates state or federal law; (ii) puts a person at risk of bodily injury, as that term is defined by Section 1.07, Penal Code, and is not immediately necessary to avoid imminent bodily injury to a peace officer or other person; and (iii) is not required to apprehend the person suspected of committing an offense; and (3) the duty of a peace officer who encounters an injured person while discharging the officer's official duties to immediately and as necessary request emergency medical services personnel to provide the person with emergency medical services and, while waiting for emergency medical services personnel to arrive, provide first aid or treatment to the person to the extent of the officer's skills and training, unless the request for emergency medical services personnel or the provision of first aid or treatment would expose the officer or another person to a risk of bodily injury or the officer is injured and physically unable to make the request or provide the treatment;

h. That as a part of the aforementioned training promulgate by Tex. Occ. Code § 1701.269, Tex. Occ. Code § 1701.256, in addition thereto, requires that a peace officer training program under Section 1701.251(a) must provide instruction in weapons proficiency;

i. That Tex. Occ. Code § 1701.251(c)(4) sets forth that the commission may consult and cooperate with a municipality, county, special district, state agency or other governmental agency, or a university, college, junior college, or other institution, concerning the development of schools and training programs for officers, county jailers, and telecommunicators;

j. That pursuant to Tex. Occ. Code § 1701.3545 the statute states, *inter alia*, a public institution of higher education selected by the commission shall establish and offer a program of initial training and a program of continuing education for constables. The curriculum for each program must relate to law enforcement management. The institution selected under this subsection shall develop the curriculum for the programs. The curriculum must be approved by the commission. Each constable must complete at least 40 hours of continuing education provided by the selected institution under Subsection (a) each 48-month period. The commission by rule shall establish a uniform 48-month continuing education training period. In addition to the requirements of Subsection (b), during each 48-month continuing education training period each constable must complete at least 20 hours of continuing education instruction on civil process to be provided by a public institution of higher education selected by the commission under

this subsection. The commission shall establish minimum curriculum requirements for the continuing education course on civil process required by this subsection;

k.  That pursuant to Tex. Loc. Gov't Code § 85.003(d) a sheriff is responsible for the official acts of a deputy and may require that a deputy execute a bond or other security. A sheriff has the same remedies against a deputy and the deputy's sureties as any other person has against the sheriff and the sheriff's sureties; and

l.  In **January 2000**, the Harris County Sherriff's Office (HCSO) approved a contract with the **Commission on Accreditation for Law Enforcement Agencies** (CALEA) with the goal of bringing the HCSO in line with international standards of performance. Such policies were subsequently modified pursuant to those standards. The HCSO received initial CALEA accreditation in 2002 and was awarded reaccreditation in 2005. The HCSO was assessed once more in December of 2010, earning an award of "Advanced Reaccreditation" in 2011.

81.  The culmination of items (a) through (l) it to demonstrate the county's chain-of-command and the upper echelon when proposing, codifying, and/or setting procedural policies when identifying rules, policies, and procedures governing the duties of constables and peace officers. A municipality can be liable under 42 U.S.C.S. § 1983 for constitutional violations resulting from its failure to properly train police officers if the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been

deliberately indifferent to the need. *Walsweer v. Harris County*, 796 S.W.2d 269, 270 (Tex. App. 1990).

82.    In addition, the Texas Commission on Law Enforcement, as organized under the Texas Administrative Code, Title 7, Part 37, Chapter 215, sets forth training requirements as well as commissions and law enforcement associations to engage in their own contracts with academic providers in the pursuit of providing training and accreditation to their officers. By way of example, 37 Tex. Admin. Code § 215.1 states that the commission may enter into a contract with: (1) a law enforcement academy training provider; (2) a law enforcement association, distance education, or proprietary training provider; or (3) an academic alternative training provider; to enter into a contract with the commission, a training provider must be approved after completing all requirements for application and eligibility; and a training provider applicant must use the electronic application process and submit any required fee.

83.    Specifically, and by way of example premised on the Texas Commission on Law Enforcement, the Harris County Sherriff's Office, and the Harris County Commissioner's Court, all of whom make up the County complained of in question, adopted and set forth the training standards and regiments set forth in CALEA which include, specifically for the current occurrence, ***Category 500: De-Escalation & Tactics***, ***Subcategory 503: Use of Conducted Electrical Devices (CED)*** which states, *inter alia*, as follows[1]:

---

[1] (*see* *https://hcsopolicy.com/policy/503-use-of-conducted-electrical-weapons-cew/?highlight=Taser*).
**NOTE: the policies and procedures set forth in CALEA is similar to and/or exceeds the requirements that Harris County, Precinct 4 Constable's Office training regimen prescribes in their course work, specifically *De-Escalation Technique #1849* the 8-hours of TCOLE proved de-escalation training required by the Texas Legislature passed SB 1849, also called the *Sandra Bland Act*. This class is also required for officers who wish to obtain either an Intermediate or Advanced certificate.** (https://www.harriscountyconstable4.com/training/courses.php).

### I. Purpose

*To establish procedures and regulations governing the use of conducted electrical devices (CED) as a use of force option.*

### II. Policy

*It is the policy of the Harris County Sheriff's Office (HCSO) to always attempt to **de-escalate and use sound tactics in any situation where force may become necessary**.*

*CEDS **should not be seen as an all-purpose device that takes place of verbal de-escalation techniques**. CEDs are not harmless, and the **potential for injury can be exacerbated by inappropriate use and deployment of the device**.*

*CEDs are deployed as additional law enforcement tools and are not intended to replace firearms or self-defense techniques. They **may** be used to **control dangerous or violent suspects when deadly force does not appear to be justified or necessary; attempts to subdue the suspects by other conventional tactics have been, or will likely be, ineffective in the situation at hand; of there is a reasonable expectation that it will be unsafe for deputies to approach within the contact range of the subject**.*

### III. Definitions[2]

*__Active Aggression__ – At this level of resistance, the subject poses a risk of immediate danger to the employee, another person, or themselves. This aggression may manifest itself through punching, kicking, striking, or any other action when apparent that the subject has the immediate means to injure an employee, subject, or another person.*

*__Actively Resisting__ – Behavior that physically counteracts an employee's attempt to lawfully control, and which creates risk of bodily injury to the employee, subject, or another person.*

*__Application__ – The actual contact and delivery of electrical impulse to the subject via probe discharge or drive stun.*

*__CED Cycle__ – A five-second electrical discharge occurring when the CED trigger is pressed and released. The CED will continue to deliver an electrical discharge until the trigger is released.*

*__Conducted Electrical Device (CED)__ – A device designed to temporarily cause neuromuscular incapacitation by administering an electric sock through fine wires attached to a pair of darts discharged from the device.*

---

[2] Plaintiff incorporates only the definitions which are relevant to the current occurrence and complaint set forth in this amended petition.

*Plaintiff's First Amended Complaint*

***Exigent Circumstances*** *– Circumstances that would cause a reasonable person to believe that prompt and unusual action is necessary to prevent physical injury to self or others.*

***Fleeing/Evading*** *– An active attempt by a person to avoid apprehension by a law enforcement officer through evasive actions while attempting to leave the scene.*

***Neuromuscular Incapacitation*** *– The effect of the CED on a subject when, through the application of a electrical pulse, the CED dominates the motor nervous system by temporarily interfering with electrical signals sent to the skeletal muscles by the central nervous system.*

***Passive Resistance*** *– Physical actions or a lack thereof that passively prevents, or attempts to prevent, the employee's attempt to control. It is a common tactic of civil disobedience and labor disputes (e.g. a subject who remains in a limp, stiff, or prone position, refuses to comply with simple directions, participates in a sit-in, locks arms in a chair, or blocks an entry way)*

## V. Authorized Conducted Electrical Device

*Only the CED* **issued by the HCSO** *is authorized for individual carry and deployment by HSCO deputies. he use of personally-owned conducted electrical devises or cartridges is prohibited.*

## VII. CED Deployment Procedures

*A. Deputies may use the CED only when circumstances known to or perceived by the individual deputy, at the time, indicate the application of the CED is reasonable to subdue or control:*

*1. A person who is* ***actively resisting*** *a deputy's commands and the deputy reasonably believes the person is creating an* ***immediate, credible threat of physical harm toward himself or herself, the deputy or others****.*

*2. A person who engaged in, or displays the intent to engage* ***in active aggression toward a lawful law enforcement action****.*

*3. A person* ***expressing intent and who has immediate and reasonable means to commit suicide or cause serious self-inflicting physical injury****.*

*4. A person* ***attempting to escape custody of the deputy****. Custody means the deputy has* ***probable cause to justify an arrest and the subject has been informed they are under arrest****. NOTE: Fleeing/Evading should not be the sole justification for using a CED against a subject.* ***Deputies should consider the severity of the offense, the subject's threat level to others, and the risk of serious injury to the subject before deciding to use a CED on a fleeing subject****.*

*5. A person* ***fleeing apprehension of a deputy known to have committed or wanted for a felony offense****.*

B. **Before** *using the CED, the deputy shall, if practical, have a backup or arrest team and **verbally warn the subject that the CED will be deployed if the subject does not cease his or her combative behavior and comply with the deputy's commands**.*

E. *If the subject **continues to refuse verbal commands, Red Dotting/Laser Painting can be an effective psychological tool and may result in compliance.** Deputies should not red dot a person or animal unless the situation warrants the use of CED.*

L. *Handcuff the subject as soon as safely possible. **Immediately upon restraining the subject and in order to assist with breathing, deputies shall position the subject in an upright seated position if possible or on his or her side. As soon as it is tactically safe to do so, check the subject's vital signs (pulse and breathing) to determine any medical difficulties.** Do not allow the subject to be placed in a prone position after restraining as it could result in possible allegations of positional asphyxia. Deputies **shall monitor the subject until releasing them to the Joint Processing Center (JPC) or medical personnel.***

M. *Deputies **should avoid attempting to control continues resistance or exertion by pinning the subject to the ground or against a solid object, using their body weight.** If body weight is needed to secure the subject, deputies should place their **knee on the shoulder area of the subject**. Placement of body weight **on the subject's back or stomach while in the prone position may cause positional asphyxia**. NOTE: Kneeling or placement of body weight to the **head and/or neck area of the subject is strictly prohibited unless deadly force is justified**.*

### **VIII. Restricted Use of Conducted Electrical Device**

*Unless exigent circumstances exist, deputies **shall not use a CED in the situations listed below;***

D. **Passive resistance, or only non-compliance with verbal commands, <u>does not justify the use of the CED</u>**.

I. *Deputies shall not intentionally display the CED or red dot a subject as a practical joe, in the eyes, **or as a form of harassment**.*

J. *A CED shall not be used when the **location would lead a deputy to reasonably conclude that the subject will sustain serious injury or death as a result of the deployment of the CED**. Examples include, but are not limited to: slanted rooftops, ledges of tall structures, **or deep water**.*

L. *When practicable, **avoid using a CED on a person in the following circumstances unless the situation justifies an increased risk:***

**8. Is located in water, mud, or marsh environment if the ability to move is restricted**.

### *IX. Post-Deployment Procedures*

*A deputy using a CED on a subject will ensure a supervisor is notified immediately after deployment. A supervisor shall response to the scene of any incident where a deputy (on or off-duty) deploys a CED on a subject.*

*Persons who have been subjected to the CED shall be treated as follows:*

**C. The deputy shall request emergency medical personnel to examine the subject on all full cartridge deployments that may contact (application) with the subject. Deputies or emergency medical personnel will apply a bandage or other appropriate medical treatment to the puncture site. All medical attention related to drive stuns will be treated on a case-by-case basis.**

84.    Premised on the aforesaid policies, it is clearly established that the Defendant county is comprised of the Commissioner's Court who, in turn, regulated the Harris County Sherriff's Office and the Constable's Office, who, conjointly, operate under and pursuant to the guidance of the Texas Commission on Law Enforcement as to training requirements. In addition to those training requirements, Harris County follows the policy and procedures outlined under CALEA, or likeminded policies thereof, and, to which, the constables are required to adhere to.

85.    At no pertinent time did Baker conduct himself in a manner which proved to be dangerous to the officers or to himself; exigent circumstances were not present; and Baker was neither fleeing apprehension or arrest nor actively resisting the officers in question. Even more so, even if Defendants were to argue that Baker was noncompliant and/or verbally aggressive, the policies under CALEA prohibit the use of CEDs for passive resistance, even though Plaintiff sets forth that he was not resisting in any way shape or form.

86.    In addition, Defendant county failed to adequately train the Defendant constables to make use of any alternative de-escalating tactics prior to the use of the unauthorized CED force as well as the constables post-taser actions demonstrate unlawful use of

*Plaintiff's First Amended Complaint*

restraining tactics against Baker by placing their knees on Baker's back and neck in lieu of the shoulder plates as prescribed in the HSCO and CALEA policies promulgated.

87.    Defendant county had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of its agents, deputy constables, employees and those acting under them, including within its constable precincts so as to protect these constitutional rights; and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiff in order to avoid causing the injuries and damages alleged herein.

88.    As a result of the aforesaid, Defendant constables have violated Plaintiff's Fourth (4th) amendment rights and objectively used unreasonable force against Plaintiff when handcuffing Plaintiff and subsequently tasing Plaintiff causing a heart attack. There acts were in noncompliance with Defendant county, and its affiliated branches, HCSO and Precinct 4 Constable's Office, deficient policies, procedures, practices, and customs relating to (i) arrests without probable cause, (ii) violating the constitutional rights of its residents by seizing them without probable cause, and (iii) applying excessive force by way of unauthorized CED use and restraint tactics by its constables.

89.    Additionally, Defendant county turned a blind eye to these constitutional deprivations by providing its deputy constables with much too broad discretion in determining what amount of force to use and whether to subject citizens to searches in violation of their constitutional rights and it is and was foreseeable that these deficient actual policies, procedures, practices and customs would result in incidents like the one giving rise to this lawsuit.

90.    The deficient policies, procedures, practices and customs set out above are caused by and amount to the conscious disregard of and deliberate indifference to the rights of Plaintiffs to be free from unreasonable seizures and excessive force.

91.    Finally, Defendant county's deficient actual policies, procedures, practices and customs relating to the use of unlawful seizure and excessive force are a producing and proximate cause of Plaintiff's damages. This also incorporates the implementation, training, and continued legal education pertaining to these trainings as to all duly licensed officers and constables within the county's jurisdiction.

92.    Defendant county retained Defendant constables, where Harris County through its Constable Precincts had actual, or at least constructive, knowledge of their propensity for the abuse of citizens and police misconduct, including the use of unlawful seizure and excessive force.

93.    Defendant county breached their duty to provide Defendant constables with adequate supervision and training premised on the aforesaid herein. The grossly inadequate supervision resulted from and was caused by Defendant county, through its constables' deliberate indifference to the rights of Plaintiff, not to be subjected to unlawful search and seizure and excessive force. Finally, the grossly inadequate supervision is a producing and proximate cause of Plaintiff's damages.

94.    Plaintiff is further informed and believes that Harris County, through its constables, never investigates or disciplines the Defendant constables for continual violations of citizens' constitutional rights. Plaintiff believes that the violation of his rights was not an isolated incident but are regular and occurring and are daily occurrences.

95.    Harris County and its constables are also liable for inadequate training of its police for the failure of Harris County and Precinct 4 to properly train or supervise its deputy constables when "*in light of all the duties assigned to specific deputy constables or employees the need for more or different training is obvious, and the inadequacy so likely will result in the violation of individuals' constitutional rights. Thus, the policymakers of Harris County can be said to have been deliberately indifferent to the need*". See *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389-90 (1989).

96.    Based on information and belief, Harris County, Harris County Commissioners Court, HSCO, and Constable 4, through the decisions of its policymaker, including Constable Mark Herman in a direct and/or indirect capacity, encouraged the aforementioned misconduct, which proximately caused the damages to the Plaintiff.

97.    Premised on the totality of the circumstances, there was no imminent threat, exigent circumstance, nor probable cause which would warrant Defendant constables' use of the taser against Baker simply over a verbal altercation as to the disposition of the repairs to the vehicle in question. The matter is further heightened given the fact that the constables' knew, or should have reasonably known, that the use of an electrical weapon in a wet environment would cause the electrical shocks to heighten the degree of damage and injury inflicted on Baker.

98.    In a Fifth Circuit decision, the case of *Ramirez v. Guadarrama*, 3 F.4th 129, 131-32 (5th Cir. 2021), there the case dealt with the tragic death of *Gabriel Eduardo Olivas*. While responding to a 911 call reporting that Olivas was threatening to kill himself and burn down his family's house, Officers Guadarrama and Jefferson discharged their tasers at Olivas, striking him in the chest. **Olivas had doused himself in gasoline**, which ignited

when the prongs of Guadarrama's taser came into contact with it. Olivas was engulfed in flames. The house burned down. Olivas died of his injuries several days later.

99.    Ultimately, the Fifth Circuit opined that district court erred in finding disputed factual issues precluded finding that the officers were entitled to qualified immunity; the officers' conduct was not unreasonable nor was the force used excessive under the circumstances because when the officers arrived at the residence, **the decedent was covered in gasoline, and he was threatening to kill himself and burn down the house, which contained six other people**; given the horrendous scene that the officers faced, involving the immediate potential for the destruction of lives and property, the force used—firing tasers—was not unreasonable or excessive, and thus, the officers did not violate the Fourth Amendment and were entitled to qualified immunity.

100.    Such is in stark contrast to the current occurrence wherein Baker was compliant, made no such threats nor posed a threat to anyone within the immediate vicinity, and was covered in water which is a harmless substances (in contrast to *Ramirez* who was dowsed in gasoline which is a hazardous substance).

## VII. – C.    HARRIS COUNTY THROUGH ITS CONSTABLE'S CUSTOM, POLICY, AND/OR  PRACTICE OF VIOLATION OF CONSTITUTIONAL RIGHTS

101.    In April of 2020 an excessive force lawsuit was filed by a Mr. Gonzalez against Harris County due to the actions of deputies of Constable, Precinct 4.

102.    In June of 2019 a lawsuit was filed against Harris County by Clarence Evans for false arrest due to the actions of deputies of Constable, Precinct 4.

103.    In 2016 there was allegations of destruction of evidence by the deputies of Constable, Precinct 4 for over 100 cases;

104.    There is ongoing litigation against a deputy and Harris County Constable Precinct 4 for the wrongful death of Jamail Amron (Cause No. 2012-55551).

105.    The policymaker responsible for this policy, practice or custom are Harris County, Harris County Commissioners Court, HSCO, and Constable 4, through the decisions of its policymaker including that of Constable Mark Herman in a direct and/or indirect capacity. Harris County has designated these known subsidiaries as the collective and joint final authority on all matters of policy, operations, and discipline of the Constable Precinct 4 with their express approval.

## VIII.   PLAINTIFF'S DAMAGES

106.    As a direct and proximate result of Defendants' unlawful, unconstitutional, and wrongful conduct, Plaintiff has and continues to suffer the following injuries and damages:

   a.   Violation and deprivation of his constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution;

   b.   Physical injuries and past, present, and future pain and suffering as a result of the excessive force and injuries dealt to this physical body and mental psychological state;

   c.   Violations and deprivations of the following clearly established and well-settled federal constitutional rights including but are not limited to: (i) freedom from unreasonable search and seizure of their persons under the Fourth (4th) Amendment to the United States Constitution;  (ii) right to equal protection under the Fourteenth (14th) Amendment to the United States Constitution, and (iii) the right not to be subject to malicious prosecution as a result of a false police report; and

d.  The conduct of named Defendant police deputy constables, were malicious, wanton and oppressive.  As a result, Plaintiff is therefore entitled to an award of punitive damages against said Defendants notwithstanding actual damages incurred.

## IX.   **<u>PRAYER</u>**

<u>107.</u>   For the foregoing reasons, Plaintiff prays for judgment against the named Defendants and requests the following relief to be awarded:

a.  For general damages of at least $ 1,000,000.00;

b.  For special damages according to proof;

c.  For punitive damages against the named individual Defendants, according to proof;

d.  For reasonable attorney's fees pursuant to 42 U.S.C. Sections 1983 and 1988;

e.  For costs of suit herein incurred; and,

f.  For such other and further relief as the Court deems just and proper.

Date Submitted: **<u>November 7, 2022</u>**

**/s/ Edward A. Rose, Jr.**
By Edward A. Rose, Jr. Attorney at Law
Edward A. Rose, Jr., Attorney at Law, PC
Attorney-in-Charge
SBN: 24081127
3027 Marina Bay Drive Suite 208
League City, Texas 77573
Phone: 713-581-6029
Fax: 832-201-9960
edrose@edroseattorneycpa.com

**/s/ Kent Motamedi**
By: Kent Motamedi, Attorney at Law
Motamedi Law, PLLC
SBN: 24107233
952 Echo Lane, Suite 320
Houston, Texas 77024

Phone: 832-582-5867
kent@motamedilaw.com
***Attorneys for Plaintiff***
***Douglas Baker***

### X.    <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing has been filed with the Court through the Court CM/ECF system and served on all parties and counsel registered with the Court CM/ECF system in accordance with Fed. R. Civ. P. 5.

**HARRIS COUNTY ATTORNEY'S OFFICE**
*Gregory Burnett*
SBN: 24057785
FBN: 3785139
*Jennifer F. Callan*
SBN: 00793715
FBN: 22721
1019 Congress, 15th Floor
Houston, TX 77002
T: (713) 274-5224
T: (713) 274-5146
F: (713) 755-8823
E: gregory.burnett@harriscountytx.gov
E: jennifer.callan@harriscountytx.gov
***Attorneys for Defendants***
***Deputy Sebastian, Constable Hoover, and Harris County***

Respectfully submitted,

***/s/ Edward A. Rose***
EDWARD A. ROSE

***/s/ Kent Motamedi***
KENT MOTAMEDI

*Plaintiff's First Amended Complaint*